UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 20-CR-181(3)(PJS)

UNITED STATES OF AMERICA,

        Plaintiff,

v.

BRYCE MICHAEL WILLIAMS,

        Defendant.

**GOVERNMENT'S SENTENCING MEMORANDUM**

For the following reasons, the United States recommends that Defendant Bryce Michael Williams receive a sentence 42 months imprisonment. The United States believes that such a sentence is sufficient, but not greater than necessary, to comport with the Section 3553(a)(2) sentencing factors.

**I.**    **Relevant Facts**

**A. Offense Conduct**

On May 25, 2020, George Floyd died while being arrested by the Minneapolis Police Department. (Presentence Investigation Report ("PSR") ¶ 11, ECF No. 125.) The nature and circumstances of Mr. Floyd's arrest, subsequent death, and the actions of the Minneapolis Police Department came under intense public scrutiny. (*Id.*) Almost immediately following Mr. Floyd's death, public protests began in Minneapolis and expanded throughout the Twin Cities metro area. (*Id.*)

Following the mostly peaceful protests that occurred on May 26, 2020, the cities of Minneapolis and St. Paul endured multiple nights of violence and destruction. (*Id.* ¶ 12.) Between May 27 and May 30, 2020, following several peaceful

protests, hundreds of individuals vandalized and looted local businesses and destroyed buildings, vehicles, and other property through arson, smashing doors and windows, and throwing objects. (*Id.*) The Minneapolis neighborhood surrounding the East Lake Street-Hiawatha intersection, near the site of the police's encounter with Mr. Floyd, was particularly hard hit, with numerous business in the neighborhood looted and partially destroyed by vandalism and arson (*Id.*) On May 27, 2020, several businesses surrounding the Third Precinct were looted, and multiple fires were set, including to an apartment complex under construction that was essentially destroyed. (*Id.*) City authorities began to discuss if the Third Precinct building should be abandoned, and vehicles, weapons, computers, and sensitive files were ultimately moved offsite. (*Id.*)

On May 28, 2020, it became clear that assistance was required. The National Guard was called on to assist in the city of Minneapolis. (*Id.* ¶ 13.) Throughout the day, hundreds of people remained gathered around the Third Precinct building. (*Id.*) A small handful of officers were stationed on the roof guarded the building. (*Id.*) A mobile fence had been erected around the building which was increasingly tested by the protestors as the evening went on. (*Id.*) At about 9:30 p.m., the approximately 15 to 20 officers that remained at the Third Precinct were ordered to evacuate as the crowd, which by some estimates topped 1,000 people, grew larger and more aggressive, and became increasingly uncontrollable. (*Id.*)

Shortly after 10 p.m., an individual breached the temporary fence that had been protecting the Third Precinct building. (*Id.* ¶ 14) Soon after, many protestors

followed and entered the building. (*Id.*) Rioters damaged property and set multiple fires in the building. (*Id.*) Firefighters could not reach the building due to the large number of protestors and the violent acts of the rioters. (*Id.*) The fires were eventually extinguished the following morning. (*Id.*)

Bryce Williams and co-defendant Davon Turner were among the first individuals who approached the Third Precinct building just after 10 p.m. (*Id.* ¶ 17.) Surveillance video shows Williams holding what appears to be a Molotov cocktail through the breached doorway, while an unidentified individual attempts to light the wick. (*Id.*) Turner, standing inside the doorway, holds the bottle with Williams before it is handed to him, goes out, and more fuel is poured on it. (*Id.*) Turner moves out of the video's frame holding the bottle, which he then brought inside. (*Id.*) Later, in another location, Williams threw a box onto an existing fire outside the building. (*Id.*)



Williams appeared in a photograph published by The New York Times. The photograph depicts him standing in front of a window of the Third Precinct, covered by plywood, and holding a Molotov cocktail. (*Id.* ¶ 18.)



Williams later participated in an interview broadcast on Instagram and was asked if he participated "in the protests and the riots, or just the protests." (*Id.*) Williams responded, "People just think like, 'oh, it's just turned into one big riot.' Like no, it was a protest during the day…peaceful protest, hundreds, I mean, thousands of people out there… participate in the protest during the day and then of course, when it's nighttime, the police get involved, and they start teargassing people, and throwing pepper spray and stuff like that. Once they start doing that, everything just breaks loose. All the citizens are like, 'ok, you wanna do that? Now we're really gonna turn it up,' and then they start throwing stuff at them, the looting starts…But at night, I participated in the riots, of course, 'cause I'm with my people, and they're all doing shit and I'm getting teargassed and stuff. Yeah of course, I'm gonna riot too – it's just part of protesting…" (*Id.*)

4

### B. Community Impact

Williams and his co-conspirators' conduct impacted the surrounding community, both those associated with the Third Precinct as well as community business owners and residents more broadly.

Multiple officers stationed at the Third Precinct submitted victim impact statements. They described the impact of seeing their workplace destroyed. Family members of law enforcement officers also submitted statements, like the young child that discussed the feeling of seeing her mother's place of work burn live on television while worrying about the safety of her mother. Civilian employees who worked at the Third Precinct also submitted statements. One individual, a Crime Prevention Specialist, addressed community members' concerns for high crime areas located in the precinct. He discussed the damage to the community by the loss of community programs like the Community Response Team and Neighborhood Coordination Officers, and how those in the community rely on those resources. Numerous community members also submitted statements describing the impact of the destruction of the Third Precinct. One described the impact to the community of the lack of police resources due to the Third Precinct being destroyed, including that the police are hampered in their ability to respond to crime due to the absence of the precinct building. Others discussed the defeat, despair, and fear they felt as community members witnessing firsthand the destruction to their local police precinct.

In the plea agreement, the parties agreed that the Mandatory Victims Restitution Act applies and that the total amount of restitution for the loss suffered by the Minneapolis Police Department was $12,000,000. (PSR ¶ 23.) Those costs include rebuilding or repairing the Third Precinct building, as well as additional costs for equipment, clean up, and overtime pay for city employees in the aftermath of the arson. (*Id.* ¶ 25.)

### C. History of the Defendant

#### 1. **Williams's Personal Background**

Williams is 27 years old. (PSR ¶ 49.) He had a relatively normal childhood and stable homelife. (*Id.* ¶ 50.) He was an average student in both high school and college, received an undergraduate education, and was a talented athlete. (*Id.* ¶¶ 50-52, 63.) He obtained a Bachelor of Science degree in business administration. (*Id.* ¶ 66.) Frankly, nothing in his background would have foreshadowed his actions that led to his conviction.

#### 2. **Williams's Criminal History**

Williams only has one previous conviction, for driving with an expired license approximately six years ago. He pled guilty and paid a fine. Apart from that single infraction, Williams has no other criminal history. His conduct in this case is certainly distinct and different. The Government concurs with the PSR that Williams's criminal history is I. (PSR ¶ 44.)

### D. Procedural History

Williams pled guilty to a single count Indictment charging him and three co-defendants with Conspiracy to Commit Arson. (PSR ¶ 2.) In his plea agreement with

6

the government, Williams agreed that the base offense level was 24 and no adjustments or enhancements. If Williams receives a 3-level reduction for acceptance of responsibility to level 21, the Guidelines range is 37 to 46 months imprisonment. (*Id.* ¶ 6.) The PSR concurs with the parties anticipated base offense level and guideline range. (*Id.* ¶ 83.) Williams also stipulated that the loss amount for purposes of restitution was $12,000,000, but the parties reserved their rights to make legal arguments about the amount of restitution to be paid by Williams.

## II. Argument

### A. Legal Background

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "[U]nder the advisory guidelines scheme, sentencing judges are required to find sentence-enhancing facts only by a preponderance of the evidence." *United States v. Scott*, 448 F.3d 1040, 1043 (8th Cir. 2006).

"[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50; 18 U.S.C. § 3553(a). The Section 3553(a) factors include "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

B.     **The Presentence Investigation and Guidelines Calculations**

The United States has reviewed the PSR prepared by the U.S. Probation Office. As noted in the PSR, the parties entered a plea agreement on September 25, 2020. Although the total offense level contemplated in the plea agreement is consistent with the PSR, the parties estimated Williams fell into Criminal History Category I. Williams did not object to the PSR.

The PSR concluded that, based on a total offense level of 21 and criminal history category of I, the resulting advisory Guidelines range of imprisonment is 37 to 46 months imprisonment.

C.     **The Appropriate Sentence**

A careful consideration of the Section 3553(a) factors warrants a sentence of 42 months imprisonment.

1.     **The Nature and Circumstances of the Offense and the Need for the Sentence Imposed to Reflect the Seriousness of the Offense**

Williams participated in an unquestionably serious conspiracy to commit arson at a police station. He and a co-conspirator attempted to light a Molotov cocktail at the entrance of a crowded building. Williams also threw a box onto an existing fire just outside the Third Precinct.

However, Williams was one of only many who participated in the near total destruction of an active police station. Investigating agents identified at least 45 areas of origin where fires had been started throughout the Third Precinct building. Dozens of unidentified co-conspirators participated in setting those fires, along with looting, vandalism, and destruction of the rest of the building. From a destruction

8

standpoint, Williams's conduct played an average (or even below average) role compared to others.

On the other hand, Williams was one of the first individuals to approach the Third Precinct building and attempt to start a fire. Some additional culpability is warranted for his early conduct, which likely spurred other protestors to enter the building and propagated additional arson and destruction.

In his written statement of acceptance of responsibility, Williams acknowledged that he is "remorseful and troubled" at his conduct. (PSR ¶ 27.) He also expressed concern as to whether his actions "set back the cause of racial justice." (*Id.*) Williams said that he came to the Third Precinct to protest and express how he felt, but that he did not believe the protests would become violent or that he would be involved in any property damage. (*Id.*) The Government takes Williams at his word and does not believe that he came to the protest to commit crimes or wreak havoc.

The protests of racial injustice following the death of George Floyd and events leading up to the arsons at the Third Precinct were unprecedented. Importantly, much of the anger and pain of protesters was directly aimed at the Third Precinct – as a building and as a symbol – because all four officers associated with the death of George Floyd were stationed at the Third Precinct. That fact in no way excuses the violence or destruction aimed at the Third Precinct. It does, however, create a juxtaposition against the violence and destruction of seemingly unrelated buildings in the community, including a school, liquor stores, pawn shops, and a post office (to

9

name but a few examples of local businesses that were looted, vandalized, set on fire, or otherwise destroyed).

Ultimately, however, the sentence imposed must reflect the unquestionably serious nature of the offense. Williams brought a Molotov cocktail into a police precinct for the purpose of lighting or accelerating a fire in the building. He participated in the near total destruction of an active police precinct that caused $12 million in damages. The neighborhoods served by the Third Precinct faced unique challenges of dealing with an increase in crime rates without a precinct to house the police force charged with protecting those neighborhoods.

In addition, the sentence should reflect the seriousness of arson, a violent felony. Williams and his co-conspirators attempted to start a fire in the entrance of the Third Precinct – with multiple people in their vicinity and an unknown number of people throughout the building. He risked the lives of the numerous individuals inside the Third Precinct. Once a fire is started, it can spread uncontrollably and cause untold damage to people or property. This is precisely why arson is considered a violent crime. A significant sentence will reflect the serious risks to and impact on the community from the arsons committed at the Third Precinct.

2.  **The History and Characteristics of the Defendant**

Williams grew up in the northern suburbs of the Twin Cities in a generally stable and caring household. (PSR ¶ 50.) He was raised by his mother and her partner, whom Williams considers to be his father. (*Id.* ¶ 49.) Williams recalled his childhood as happy and supportive. He got along well with his family and befriended

other children in his neighborhood. He was a talented athlete involved in several different sports. He maintained good grades. (*Id.* ¶ 50.) He was involved in his church.

His childhood was not without its challenges. His family struggled financially at times. (*Id.* ¶ 52.) He established a relationship with a man that his mother thought was his biological father. However, after numerous years, a paternity test established that the man was not his father, and their contact suddenly ceased. (*Id.* ¶ 51.)

Williams has two young children. (*Id.* ¶ 54.) Although he is not presently together with the mother, he remains actively involved in the children's' lives. (*Id.*)

In many ways, Williams was afforded much opportunity. He signed up for the Army National Guard while still in high school to have a means to pay for college. (*Id.* ¶ 68.) He attended basic training and was two weeks away from graduation after an incident occurred that would have caused him to need to restart basic training to continue his service. (*Id.*) Williams opted to accept an "other than honorable discharge" and end his service so that he could continue his college schedule. (*Id.*) He was a gifted athlete and earned a scholarship to play basketball in college. (*Id.* ¶ 65.) After attending several different schools – in large part motivated by basketball – he graduated from the University of Wisconsin in Stevens Point in 2017 with a Bachelor of Science degree in business administration. (*Id.* ¶ 66.)

At the same time, Williams was clearly influenced from growing up as a biracial man in a predominately white community. Williams's mother recounted a story of Williams being involved in a car club with his father. Many of the members were minorities. According to Williams's mother, when Williams was a child, he and

his father were once pulled over by police and removed from the car at gunpoint due to mistaken identify. (*Id.* ¶ 56.) Williams recounted attending college in Nebraska, where he and other players on the basketball team were among the only people of color in the town. (*Id.* ¶ 65.) Part of the underlying anger that lead Williams to protest at the Third Precinct – and ultimately to commit this crime – certainly shares some connection to his experiences growing up and experiencing racism firsthand.

Williams has virtually no previous criminal history and no history of violent conduct. Save for a misdemeanor conviction for driving with an expired license, Williams has no other criminal history. (PSR ¶ 43.) Williams promptly accepted responsibility for his wrongdoing. He met with the Government. He entered a guilty plea early and admitted his culpability.

   3.  **The Need for the Sentence Imposed to Promote Respect for the Law and Afford Adequate Deterrence.**

It is almost unfathomable to think that an active police precinct in the city of Minneapolis was overrun, looted, vandalized, and set on fire. This conduct represents a total breakdown of respect for the law. A significant sentence is necessary to promote respect for the law.

The sentence should have an overall deterrence effect. The sentence imposed must be tailored to prevent Williams from committing another crime. This is Williams's first felony conviction and marked a significant departure from his law-abiding history. The Government does not believe that a significant sentence in necessary to provide specific deterrence to prevent Williams from committing another similar crime. However, general deterrence is also necessary to demonstrate the

importance of laws and deter future conduct. *See Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) ("Congress specifically made general deterrence an appropriate consideration . . . and [the Eighth Circuit has] described it as 'one of the key purposes of sentencing.'") Others are more likely to be deterred from committing similar violence and destruction if they learn they will pay a stiff price for it.

A sentence of 42 months imprisonment will serve the needs of sentencing to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence.

    4.    **The Need to Avoid Unwarranted Sentencing Disparities**

Three co-defendants have plead guilty and are presently awaiting sentencing before this Court. The Government is not aware of any other cases that would create an unwarranted sentencing disparity.

### III. Conclusion

For all the above reasons, the United States respectfully requests that the Court impose a sentence of 42 months imprisonment.

Respectfully submitted,

Dated: March 9, 2021

W. ANDERS FOLK
Acting United States Attorney

/s/ *Harry M. Jacobs*

BY: DAVID P. STEINKAMP
HARRY M. JACOBS
Assistant U.S. Attorneys