UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 20-CR-181 (3) (PJS/BRT)

United States of America,

               Plaintiff,

v.

Bryce Michael Williams,

               Defendant.

**DEFENDANT WILLIAMS'S POSITION REGARDING SENTENCING**

## I.    Introduction

This is not a typical arson case, and Bryce Williams is not a typical arsonist.

On May 25, 2020, George Floyd (a black man) was killed by Minneapolis Police Department Officers who were in the process of arresting him on suspicion of passing a counterfeit $20 bill. This event inflamed racial tensions and within days there were protests worldwide[1] as well as in all fifty states against, generally, police brutality, police racism, and disparate racialized treatment from law enforcement.

---

[1] For example, shortly after the killing, CNN documented protests in England, Switzerland, Brazil, Italy, Spain, Scotland, Hong Kong, the Netherlands, Belgium, Portugal, Australia, France, Wales, Germany, South Africa, South Korea, Kosovo, Tunisia, Japan, Bulgaria, and Ireland. https://www.cnn.com/2020/06/06/world/gallery/intl-george-floyd-protests/index.html

The Minneapolis-St. Paul area was the epicenter for these, with daily protests following George Floyd's death. The majority of these were peaceful and nonviolent affairs, although some came with rioting, looting, arson, and property destruction.

Indeed, on May 28, a protest which began peacefully escalated to the point where it can only be called a riot. That night culminated with a group of people, including Mr. Williams, collectively burning down the Minneapolis Police Department's Third Precinct building. Mr. Williams was identified by law enforcement and charged, along with a couple others, with conspiracy to commit arson. He entirely accepts responsibility for his actions. He was the first defendant to plead guilty and has done everything right during the case.

We respectfully submit that the unique factors surrounding this case and Mr. Williams justify both a downward departure under the "Aberrant Behavior" guideline provision and a dramatic downward variance from the 37-46 month guideline sentence.

Neither party has unresolved PSR objections and the defense has put forth a position regarding restitution in a separate filing. Accordingly, the bulk of this position regarding sentencing is devoted to an in-depth discussion of the facts surrounding the nature of the offense and Mr. Williams's personal characteristics. Following that is an analysis of why those facts support both a departure under U.S.S.G. § 5K2.20 and a variance under 18 U.S.C. § 3553(a).

2

## II.    Factual Background
### A.  Bryce Williams's Reaction to the Death of George Floyd

In May 2020, Mr. Williams was 26 years old. He graduated college in 2017 from the University of Wisconsin – Stevens Point with a Bachelor of Science in Business Administration (after transferring a few times, mostly due to basketball-related reasons) and seemed to be settling down in Staples, Minnesota. Earlier in 2020, he and his longtime girlfriend, Taylor, bought a house in Staples where they lived with their first child, Kinley (their second, Kalix, would be born later in 2020).

At the time of the offense Mr. Williams was unemployed due to the COVID-19 pandemic, but his two most recent jobs were as an assistant basketball coach for UW-Stevens Point and as a paraprofessional for the Freshwater Education District. He worked there for a little over a year.  He was a law-abiding young man with zero criminal history points.

George Floyd's death, and the events surrounding it, were incredibly formative for Mr. Williams. They were for many people, especially young people, but perhaps hit Mr. Williams (a biracial man) differently because of his complex history with the police. Despite his law-abiding nature, he has had a number of negative interactions with police officers. Some of these are detailed in the PSR. For example, Mr. Williams's mother described trips with Mr. Williams's stepfather, Max (who is Black), when he participated in a car club. She relayed "that during these drives, invariably someone would be pulled over by police." (PSR ¶ 56). His mother also described an incident when he was a child

3

where the family was "removed from a vehicle by gunpoint due to a case of mistaken identity." (*Id*.). The PSR also relays Mr. Williams's statement that, when in college, he saw Black friends be falsely accused of doing things they did not do. (*Id*. at ¶ 65). Some negative interactions were not detailed in that summary– for example, Mr. Williams reports that he has been pulled over by the police numerous times, especially when driving to and from his college programs in Nebraska and Wisconsin. These sorts of racialized incidents gave Mr. Williams the underlying belief that law enforcement treated people differently based on their race.

### B.  Bryce Williams's Actions on May 28th

Mr. Williams had increasingly heard reports of police violence across the nation and viewed George Floyd's death as yet another unnecessary and tragic outcome of police misconduct. He wanted to make his voice heard and he wanted to do so peacefully. Mr. Williams decided to drive down to Minneapolis to participate in the May 28, 2020 protest. This was the first George Floyd protest he attended and would of course become the arson against the Third Precinct.

Mr. Williams knew the protest would be passionate but he expected it would be peaceful. When he drove down to the protest he did not bring any weapons, flammable material, or gear to be used for violent acts. He brought his phone and documented in real time what he was doing. When he arrived it was daytime. There were a huge number of people there who were chanting slogans, marching, filming with their phones, and talking to the media. As the day turned to night, the crowd got more and more upset and started

clashing with the police presence. Pepper spray and teargas were met with thrown objects like rocks and bottles as the crowd grew more assertive. The crowd, apparently fueled by "professional" agitators[2] turned their ire to buildings, in relevant part the Third Precinct building. Mr. Williams was thoroughly swept up in the fervor of the crowd by this point.

The police officers guarding the building backed out of the area in an attempt to deescalate. Just after they did so, at about 10:00 pm, an individual broke through the perimeter the police had set up and took it down. Thereafter dozens of people, including Mr. Williams, rushed through. The passion of the crowd overcame his better judgment by this point and he had unfortunately become a willing participant. Someone–likely one of the aforementioned "professional" agitators, as it is unclear who else would have access to one–handed him an unlit Molotov cocktail and Bryce helped it become lit and passed it to a person inside the police department. Mr. Williams milled about with the crowd for a bit then returned to throw a box on a small fire just outside the precinct. He never went inside the building.

### C.  Bryce Williams Continuing to Strive for Racial Justice after the May 28 Events

In the days and weeks after the May 28 protest, Mr. Williams joined a small group of filmmakers who were traveling around the country documenting different peaceful protests regarding police misconduct. It was very difficult for him to be away from his family, but he thought the causes of racial justice were too important to pass by. He went

---

[2] Some agitators were with the crowd and some were apparently not, as people were posting instructions on social media of how to make incendiary devices such as Molotov cocktails.

to protests in numerous cities. He spoke at some of these and they were recorded online

through social media.

The defense wishes to highlight two sections of one YouTube video[3] for Your

Honor that we think say a great deal about Mr. Williams.

- The first speaks to Mr. Williams's nonviolent approach– that although he is passionate he wants the protests to remain peaceful.

  There, an interviewer asks Mr. Williams "If you were to lead this thing versus just getting swept up in it what would you want to accomplish – what would you want them to see?"

  Mr. Williams responds: "I would want to stand up in front of thousands of people on a microphone and tell them why we're not going to do no more damage. We're gonna do this protest peacefully now. Alright." (3:39-3:59).

  Here, before his arrest and before he even knew he was under suspicion for the

May 28th conspiracy, he had already said his protests were going to be peaceful and not

do any more damage.

- The second speaks to Mr. Williams's dedication to the cause. He is standing outside of his car talking to his girlfriend Taylor and their child Kinley by phone. The phone is on speakerphone. The video starts with Kinley crying and saying "Daddy" and Mr. Williams responding "I know, I'm not – I'm not there Boo, I know… I'm sorry." You can hear Kinley crying and Taylor tells him "You need to do something. You need to change it up because you need to be here." Mr. Williams responds "Okay. It's only gonna be for a little while." Taylor says, interrupting Kinley crying, "she's heartbroken." Mr. Williams gets emotional and the camera cuts to a new scene.

  There Bryce is explaining to the interviewer why he believes he cannot go home yet. With tears plainly visible in his eyes he explains, "She's two and a half, you know. She – she doesn't understand, like, what I'm doing, you know. Just – let it be known that my daughter will understand later in the future that I'm here to change

---

[3] The video is available at https://www.youtube.com/watch?v=3L5BDSyHBFc.

the world – to impact the world in a positive way. Like... She can cry now but I would rather have her cry now than crying later for something that she didn't need to be doing. Or, or my son, unborn child, unborn son, who is gonna grow up a black man it – is – living the same way that we're living right now. You know what I mean? S*** needs to change…"
(4:13-5:35).

These speak to the extent to which Mr. Williams's behavior on May 28th truly was aberrant, both in the context of his life and in the context of his passion for racial justice.

His goals were not to cause violence or destruction, but instead to change what he believed were (and are) systemic problems within the justice system and build a better world for his kids. On May 28th he was swept up in the fervor, but in the days after he was willing to leave his home, where his daughter and unborn son lived, to peacefully argue for change. Perhaps his greatest fears around what he did on May 28th is whether he, by participating in this conspiracy, set back the cause of racial justice that so many are working so hard to progress.

### D.  Bryce Williams's Post-Arrest Behavior

Since Mr. Williams was arrested he has done everything the Court, Probation, and Counsel have asked him to do. He is working two jobs while completing the coursework necessary to be a licensed realtor. (PSR ¶¶ 67, 70, 71). He has so far completed a 30-hour pre-license course and his national and Minnesota salesperson exams. (*Id*. at ¶ 67). He "has reported as directed, submitted all negative drug tests, maintained employment, and complied with all other Court ordered conditions of release". (*Id*. at ¶ 7). This case, while incredibly anxiety-inducing for him, has also motivated him to do everything he can to

support his children. This Court can have a high degree of confidence that Mr. Williams

will continue to act appropriately in the future.

## III.    A Downward Departure for "Aberrant Behavior" is Warranted

Mr. Williams has moved for a departure on the ground of aberrant behavior

(U.S.S.G. § 5K2.20). That provision says that a Court may depart downward if a

defendant committed a single criminal occurrence or single criminal transaction, and (1)

committed it without significant planning, (2) it was of limited duration, and (3) it

represented a marked deviation by the defendant from an otherwise law-abiding life. *Id*.

at (b)(1-3). The defense submits that these factors are met here. Mr. Williams's

conspiracy was short-lived, lasting just part of one day. He did not know his co-

conspirators. He did not plan the offense at all, indeed he traveled with no "arson-related"

materials. And Mr. Williams's life was otherwise law-abiding; he accrued zero criminal

history points. There are four disqualifying factors listed in part (c), none of which apply

to Mr. Williams.

The extent of such a departure (and indeed whether to grant it) is up to the

discretion of the Court, but the defense contends this departure buttresses the strong

variance-related reasons to give a below-guidelines sentence.

## IV.    A Downward Variance is Warranted

The defense submits that this atypical case warrants an atypical sentence. We

contend that a guideline sentence would not appreciate the nature and circumstances of

the offense and the history and characteristics of Mr. Williams. A major downward variance would still provide just punishment for the offense and would still provide adequate deterrence for other offenders. Accordingly, we submit that such a sentence would be appropriate under the 18 U.S.C. § 3553(a) factors.

A. The offense factors are different (and lesser) than a typical arson conspiracy

Mr. Williams acknowledges this was a serious offense. Arson is always serious, and the fact that the building in question was a police station elevates that, as does the fact that this offense was tied in with a conflict between incensed citizens and police officers.  But there are countervailing factors that make the nature of Mr. Williams's acts less severe than typical arson conspirator's.

A more typical arson conspiracy would be when a group of people who know each other make an explicit plan together to damage a building by fire or explosives at a later time and they do so with the intent to either enrich themselves or cause physical or economic harm to someone. *See, e.g.*, *United States v. Anderson*, 783 F.3d 727, 734-35 (8th Cir. 2015) (discussing an arson where, after a weeks-long planning phase, a part owner of a restaurant, along with at least two others, snuck into his own restaurant at night and placed fourteen containers of gasoline throughout the restaurant before detonating an explosive device, in an attempt to collect insurance money.); *United States v. Farish*, 535 F.3d 815, 818 (8th Cir. 2008) (discussing an arson where, after the defendant believed a friend of his girlfriend's damaged his car by scratching it with a key, hired someone to start a fire at her home (among other acts)); *United States v.*

*McMasters*, 90 F.3d 1394, 1396 (8th Cir. 1996) (discussing an arson in which a gang involved in drug trade constructed three pipe bombs and used them to bomb the home of a rival drug dealer who refused to pay them a "tax" on his sales).

This case is different. The conspiracy was between—at least from Mr. Williams's perspective—people who did not know each other and—in Mr. Williams's case—did not plan any sort of offense in advance. The conspiracy was an unspoken and unplanned one between at least hundreds of people, most of whom had never met before and never will again. This group's intent was not to harm people or enrich the participants but instead was an escalated reaction to what it viewed as a racial killing. These factors diminish the "seriousness" of the offense in comparison to the typical arson conspiracy. At *least*, this combination of unique aggravating and mitigating factors make this case so unlike the typical offense that it is outside the "heartland" and the guidelines are less instructive a starting point. *See Kimbrough v. United States*, 552 U.S. 85, 89 (2007) ("a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case 'outside the 'heartland' to which the Commission intends individual Guidelines to apply.") (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)).

B. The offender-related factors are *strongly* mitigating, supporting a major downward variance

Mr. Williams submits the personal history discussed at length above supports a major downward variance. The facts above and in the PSR – which are not disputed – show that Mr. Williams is not a typical arsonist. He is a young man with family and

10

community support, a Bachelor of Science degree in Business Administration with a Concentration in Management, and a long history of law-abiding behavior. He should not have committed the offense—his doing so was the worst decision he made in his life— but that act was a transient instance of bad judgment not borne of greed or a desire to hurt others.

He hopes that night does not define his life. The defense again emphasizes Mr. Williams's words after May 28th in which he denounced violence and property damage. In the months since his offense and during his case he has acted appropriately. He has the motivation and the tools to continue to act appropriately. He has his family behind him, strong social support, and the motivation and ability to remain employed. He is incredibly amenable to Court and Probation's directives. His future is bright.

### C.  An incarcerative sentence is not necessary to provide a specific deterrent effect to prevent Mr. Williams from reoffending

The defense submits that Mr. Williams' long history of behavior before and after the offense shows that he will not reoffend. He does not need a prison sentence to "learn his lesson." He has already learned it.

That Mr. Williams is very unlikely to reoffend is borne out by the advanced data and analytics supplied by the United States Sentencing Commission in a "Recidivism Report."[4] The Recidivism Report emphasizes the "close correlation" between criminal

---

[4] *Recidivism among Federal Offenders: A Comprehensive Overview*, UNITED STATES SENTENCING COMMISSION, March 2016 (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf) (hereafter, "Recidivism Report").

history and rearrest rates. The data shows that defendants in criminal history category I, with a 33.8% chance of rearrest, are far less likely to reoffend than those in even categories II (54.3%) and III (63.3%), let alone beyond. (Recidivism Report at page 19). Somewhat surprisingly, even amongst Category I defendants there are stark differences – the Commission explained:

> There are differences in the rearrest rates for offenders with different criminal history point scores within each CHC, but the largest differences are for offenders within CHC I[.]

And,

> "Offenders with zero criminal history points had a lower rearrest rate than offenders with one criminal history point (30.2% compared to 46.9%), a slightly longer recidivism time to rearrest [. . .] and less serious rearrest offenses.

*Id*. at 6.

The Recidivism Report also emphasizes that offenders with college degrees, like Mr. Williams are drastically less likely to reoffend with a 19.1% rearrest rate compared to those without high school degrees (60.4%) or with high school but no college education (50.7%) (*Id*. at 24). This may be due to some of the aforementioned "tools" defendants have to act appropriately. Mr. Williams has these in spades.

Finally, the defense wishes to emphasize from the study that probationary offenders and those given a sentence of fewer than six months imprisonment had much lower rearrest rates than those given longer sentences. (*Id*. at 22). These analytic factors are not taken into account by the guidelines and can affirm this Court's confidence that Mr. Williams will not reoffend regardless of the sentence issued.

Indeed, the United States Sentencing Commission published a report in April 2020 in which it concluded that *sentences under sixty months do not have a specific deterrent effect*.[5]  The "Deterrence Report" was the "seventh in the recidivism series" (Deterrence Report at 2). The purpose of the Deterrence Report was to run sentencing data through three different models to assess whether various sentence lengths made those sentenced (a) more likely to commit crimes (a criminogenic effect), (b) less likely to commit crimes (a deterrent effect), or (c) no statistically significant effect in either direction.

Each of the three models found a deterrent effect for sentences over 120 months but none found a statistically significant deterrent effect for sentences of 60 months or less. The Report concludes: "the Commission has no basis to conclude that incarceration for 60 months or less has a criminogenic or deterrent effect." (*Id*. at 30).

The defense submits the general deterrent effect is logically weak in this case. The circumstances surrounding the Third Precinct arson were so unique–they were a singular reaction to a singular event, and the individual actors made their decisions based on inflamed passions rather than logical calculation–that other would-be offenders would not likely look at a prison sentence imposed on Mr. Williams and use it as part of a rational weighing process to discourage them from committing other similar crimes. This is especially true because of the hundreds of coconspirators only a couple have been charged, and, according to a leading researcher, "[r]esearch to date generally indicates

---

[5] *Length of Incarceration and Recidivism*, UNITED STATES SENTENCING COMMISSION, April 2020 (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2020/20200429_Recidivism-SentLength.pdf) (Hereafter "Deterrence Report").

that increases in the certainty of punishment, as opposed to the severity of punishment, are more likely to produce deterrent benefits."[6]

D. A well below-guideline sentence would provide just punishment for the offense and would protect the public

A substantially below-guideline sentence would in no way mean Mr. Williams has avoided the consequences of the offense. Regardless of the outcome of this case, Mr. Williams will be under Court supervision for years. He will have lost his right to vote— which is incredibly important to him—unless and until his rights are restored. He will have limited freedom. Concerns like these are why the United States Supreme Court has emphasized that even probation is a meaningful punishment:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty […]. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court. Gall, for instance, may not patronize any establishment that derives more than 50% of its revenue from the sale of alcohol, and must submit to random drug tests as directed by his probation officer.

---

[6] Valerie Wright, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, THE SENTENCING PROJECT, Nov. 2010 at 3 (available at https://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf). Indeed, according to two leading scholars cited therein, "punishment certainty is far more consistently found to deter crime than punishment severity, and the extra-legal consequences of crime seem at least as great a deterrent as the legal consequences." (*Id*. at 6).

*Gall v. United States*, 552 U.S. 38, 48-49 (2007) (internal citations and quotations omitted).

The stress and anxiety of being prosecuted for a federal felony weighs heavily on almost all defendants. This is certainly true for Mr. Williams who, unlike most defendants, has been the subject of intense local and national media attention during his prosecution. He has had to forego employment opportunities as a result of the offense. A sentence based on a major downward variance would still result in Mr. Williams being substantially and justly punished for his acts on May 28, 2020.

## V.    Conclusion

For the foregoing reasons, the defense respectfully submits that the unique factors of this case and the positive characteristics of Mr. Williams justify a substantial downward variance and a below-guideline sentence.

Respectfully submitted,

Dated:     March 9, 2021          /s/ Ian S. Birrell
                                   Andrew S. Birrell (Attorney No. 133760)
                                   Ian S. Birrell (Attorney No. 0396379)
                                   **Birrell Law Firm PLLC**
                                   333 South 7th Street, Suite 2350
                                   Minneapolis, MN 55402
                                   Phone: (612) 238-1939
                                   andy@birrell.law | ian@birrell.law
                                   *Attorneys for Defendant*